UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| CHRISTOPHER WHITE, | ) | |
| --- | --- | --- |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| vs. | ) | Case No. 4:08CV00288 AGF |
| | ) | |
| TROY STEELE, | ) | |
| | ) | |
| Respondent. | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court on habeas Petitioner Christopher White's motion (Doc. No. 76), as supplemented (Doc. No. 84), to alter or amend the judgment entered against him on September 16, 2014. For the reasons set forth below, the motion, as supplemented, will be denied.

## BACKGROUND

As set forth in the Court's Memorandum and Order (Doc. No. 73) accompanying the September 16, 2014 Judgment in this case, a jury convicted Petitioner on January 16, 2004, of acting with others, including Juanne Kennell, in the June 21, 2002 murder of Freddie Chew and assault of Jeffrey Shockley. Kennell was convicted for his part in the same crimes, with Petitioner's trial commencing several days after Kennell's conviction. One of Petitioner's claims for federal habeas relief was that the state violated his rights under *Brady v. Maryland*, 373 U.S. 83 (1963) (holding that due process requires the prosecution to disclose to the defense material impeachment evidence), by withholding evidence that Shockley, who was a key prosecution witness against Petitioner, received

favorable treatment, or promises thereof, in exchange for his testimony against Petitioner.[1]
Kennell raised a similar *Brady* claim in his own action seeking federal habeas relief,
*Kennell v. Dormire*, 4:09CV00407 AGF (E.D. Mo.).

A detailed review of the facts underlying Petitioner's *Brady* claim (and Petitioner's other claims) is set forth in the September 19, 2014 Memorandum and Order, and incorporated herein. On October 14, 2014, Petitioner filed the present motion to alter judgment. The only claim at issue in the motion to alter judgment is Petitioner's *Brady* claim. Petitioner had asserted that evidence in the record suggested that the state had "hinted" at a deal with Shockley in connection with two state felony charges that had been filed against Shockley on February 18, 2002, and were still pending at the time of Petitioner's trial. On February 9, 2004, shortly after Petitioner's trial, Shockley pled guilty to the state felony charges, and was sentenced to a suspended imposition of sentence and one year of unsupervised probation. This Court concluded that even if there were a hint from the state for sentencing leniency, any *Brady* violation with respect to such a hint would have been harmless, in that despite its nondisclosure, the verdict was worthy of confidence and that there is no reasonable probability of a different result. (Doc. No. 73 at 15.)

In support of his motion to alter judgment, Petitioner has submitted three new exhibits. The first exhibit is an affidavit dated October 9, 2012, by David Haubrich, an investigator hired by Petitioner and Kennell to interview Robert Stewart, the state's other

---

1   Petitioner also asserted a dependent due process claim of prosecutorial misconduct, arguing that the state failed to correct Shockley after he testified that he had not made any deals with the State in exchange for his testimony.

2

eyewitness, besides Shockley, who testified against Petitioner and Kennell. Haubrich attested that he interviewed Stewart on August 2, 2012, and that Stewart told him that he (Stewart) was not offered any deal related to his arrest on July 1, 2002, to testify against Petitioner and White. Rather, the judge in his case offered to drop the charges if he would enlist in the army, which Stewart did. Haubrich further stated that Stewart told him that he did not get a good look at the shooters; that when the police showed him the photo array, he had trouble picking out the shooters; that the police then gave him a break at the same time Shockley was on a break and that at that point Shockley "coached" him, describing Petitioner as having darker skin and White having lighter skin; and that after that, he (Stewart) was able to choose the photos that best fit Shockley's description. Haubrich went on to attest that Stewart said he never heard Shockley say he was offered "some kind of a deal, but it was obvious, because he never went to prison on his serious [felony] charges" and "there was something going on between the police and Shockley." Haubrich ended by attesting that he tried numerous times to obtain a sworn statement from Stewart, but that Stewart refused. (Doc. No. 77-1.)

The second supplemental exhibit is a declaration by Jerome Johnson, an acquaintance of Shockley's and Stewart's, dated October 24, 2012, in which Johnson stated that Shockley and Stewart told him they could not recognize the men who shot Chew because the shooters were wearing ski masks, and that they (Shockley and Stewart) just guessed as to who the shooters were. (Doc. No. 77-2.) The third supplemental exhibit is a copy of a typewritten undated, unsigned plea agreement offered to Shockley by the state. (Doc. No. 77-3.)

The Court granted the requests of Kennell, whose habeas petition was still pending, and Petitioner for a joint evidentiary hearing on their respective *Brady* claims, and deferred ruling on Petitioner's motion to alter judgment until after the hearing.

**Federal Habeas Evidentiary Hearing** (Tr. at Doc. Nos. 117 and 120)

Nine witnesses testified at the September 2015 evidentiary hearing: Stephen Reynolds (the public defender who represented Kennell in pretrial matters); Shockley; Stewart; Johnson; Robert Taaffe (the public defender who represented Shockley at his February 9, 2004 guilty plea and sentencing); Kennell; Petitioner; Daryl Smallwood (an inmate who knew Shockley and Kennell in jail/prison in 2007 or 2008); and Robert Craddick (the prosecutor in both Kennell's and Petitioner's trials).

Reynolds testified that he was "relatively confident" that he was the "SR" referenced on a February 7, 2003 Conflict Transfer Request Form, and similarly confident that he was the author of the form. This internal Public Defender's Office document stated as follows:

> Bob Taaffe represents Jeff Shockley in 021-0715. SR has just learned that Bob negotiated a deal for Jeff Shockley to testify against [Petitioner], who was just arraigned on 1/13/03, as well as possibly another defendant, Christopher White (who may also be coming down the pike, as I think we just interviewed that guy today).

Reynolds had no independent recollection of the form or of speaking with Taaffe about anything noted therein, but testified that Taaffe might have told him that he (Taaffe) was "trying to negotiate a plea agreement" for Shockley.

Shockley testified that he was not promised anything in exchange for his testimony against Petitioner and Kennell, and that Chew was like a brother to him and that was why

4

he testified against Petitioner and Kennell. Shockley testified that in July 2002, about a month after Chew's murder, he was in danger in his apartment due to being a witness in the case and the police moved him to a hotel for two to four weeks and covered his expenses there. Shockley testified that the men who shot at Chew and the others were not wearing ski masks, and that when he saw their faces he recognized them because he knew them from before. Shockley denied that he had coached Stewart with respect to identifying the men who shot Chew, and denied that he had told Johnson that he (Shockley) could not identify the shooters. He also denied that he had given a copy of the Conflict Transfer Request Form to anyone. He testified that he had agreed to testify against his brother, who had been charged with a separate crime, because his brother asked him to so that he (Shockley) could stay out of jail for the vehicular homicide. In the end, his brother pled guilty to the homicide charge.

Shockley testified that he had no expectation that he was going to get any favor from the state as a result of his testimony against Petitioner and Kennell. He testified that when he pled guilty to his state felony charges he thought he might go to jail, and planned to throw himself on the mercy of the plea court.

Johnson testified that after the Chew shooting, Shockley and Stewart told him that they could not identify the shooters because the shooters had ski masks on.

Stewart testified that he was able to identify Petitioner and Kennell as two of the shooters because he had seen them in the neighborhood on several occasions beforehand and recognized them. He stated that he testified at their trials because his friend (Chew) had been brutally murdered and he wanted to see justice done. He stated that no one ever

5

made a deal with him in exchange for his testimony and that Shockley did not coach him with the identifications. He admitted that he spoke with David Haubrich , an investigator for approximately 30 to 45 minutes, but denied ever telling Haubrich that it was too dark for him to clearly see the faces or identities of the shooters, or that Shockley coached him. He said it was evident that Haubrich was asking leading questions designed to affect the outcome of the case.

Taaffe testified that although he attempted to negotiate a plea deal for Shockley, no formal or tacit agreement was ever reached. Taaffe testified that once Shockley agreed to testify against Petitioner and Kennell, Taaffe tried to get the state to agree to dismiss the pending felony charges against Shockley, but that ultimately Shockley pleaded "open" and the only reason for that would have been that negotiations with the state had broken down. With respect to the Conflict Transfer Request Form, Taaffe testified that if the state made an offer to one of his clients to testify against another individual represented by the Public Defender's Office, he would have reported a conflict of interest to the appropriate person. Taaffe testified that according to his notes, at about the time the Conflict Transfer Request Form was dated (February 7, 2003), the state had made an offer to Shockley, but Shockley declined the offer because it did not grant him immunity. In addition, the offer required Shockley to testify against his brother in another criminal matter, and Shockley did not want to do that.

Taaffe believed that Shockley wanted to testify against Petitioner and Kennell because they had killed his friend. Taaffe also explained that he was the one who continued the felony case against Shockley until Petitioner's and Kennell's trials were

6

over, thinking Shockley would get some sentencing benefit from having testified for the state in those cases, and that he (Taaffe) would have communicated this to Shockley, even though there was no deal with the state. When asked by the state about his case note from November 13, 2003, that stated that that the state "hinted at a potential nolle," Taaffe indicated that when Shockley agreed to testify for the state against Kennell and Petitioner, "it was clear

. . . that he was not going to get anything worse than probation and [Taaffe] had hoped [he] could talk the State into dismissing the charges after [Shockley] testified." Taaffe explained that the original recommendation was for probation anyway and that there was "nothing in the [November 13, 2003] note to indicate that Craddick made a promise that [Shockley] wasn't going to go to jail," and in fact, no such promise was made. Nevertheless, Taaffe then stated that Craddick was the one who "hinted at a nolle."

On cross examination, Taaffe testified unequivocally that there was no "secret deal" with the state in exchange for Shockley's testimony, and that he would have told Shockley at the time he took the stand against Kennell and Petitioner that "we were hoping to get a better deal from the State with his cooperation and/or hoping to get a better disposition from the Court if he testified on behalf of the State." *Id*. at 135-36.

Kennell testified that in January 2009, Petitioner mailed him a copy of the Conflict Transfer Request Form described above, stating that he got it from Smallwood.

Petitioner testified that in 2007 or 2008, Smallwood gave him a copy of the Conflict Transfer Request Form and Petitioner then sent it to Kennell. Smallwood testified that in

7

2007 or 2008, he was incarcerated in the same jail as Shockley, and Shockley gave him the Conflict Transfer Request Form and asked him to give it to Petitioner, which he did. Smallwood testified that Shockley told him he did not "see anything" at the shooting and had lied at Kennell's and Petitioner's trials to get a deal. Shockley was recalled as a witness and denied giving Smallwood the Conflict Transfer Request Form.

Craddick testified that he did not have a specific memory of conversations with Taaffe regarding a deal for Shockley, but definitively stated that he (Craddick) never offered to dismiss the charges against Shockley, or hinted that he would. He testified that Shockley told him that he would testify against Petitioner and Kennell because his best friend had been killed, and so he (Craddick) was not concerned that Shockley would refuse to testify unless the state gave him something in exchange. Craddick explained further that in light of Shockley's age and lack of a criminal record, Shockley was likely to receive supervised probation, which was what Craddick would have offered him anyway, and so Craddick had no motivation to offer Shockley a deal because it would have only negatively impacted Shockley's credibility. Craddick did not recall whether Shockley was put up in a hotel before Kennell's and Petitioner's trials, but he explained that it was the prosecutor's office's practice to do so when a witness did not feel safe.

**Post-Hearing Evidence and Arguments of the Parties**

Documents from the St. Louis City Circuit Attorney's Office indicate that the Victim's Services Unit paid for Shockley to stay at a hotel from July 28, 2002, until August 5, 2002, and in October 2002, paid a little over $1,000 for Shockley and his mother to relocate to an apartment in another neighborhood. Shockley's probation files

8

were also provided to Petitioner after the hearing. They show that Shockley was placed under the supervision of the Missouri Board of Probation and Parole, and although field violation reports were filed by his probation officer, the plea court did not revoke Shockley's probation, which he completed on February 9, 2005.

The parties submitted simultaneous post-hearing briefs. Petitioner argues that Shockley was not a credible witness at the evidentiary hearing, and that the hearing testimony and exhibits show that there was a tacit deal between the state and Shockley for sentencing leniency in exchange for his testimony against Petitioner and Kennell. Petitioner also asserts that a *Brady* violation has been made out based on the state's failure to disclose the payments made to Shockley for lodging and relocation, and failure to disclose Shockley's agreement to become a state's witness against his brother. This latter non-disclosure was impeachment evidence, according to Petitioner, because it would have shown Shockley's willingness to testify against others to advance his own interests.

Respondent argues that the record, including the testimony at the evidentiary hearing establishes that there was no formal or tacit agreement between the state and Shockley that Shockley would receive some sort of benefit in exchange for his testimony against Petitioner and Kennell. With respect to the nondisclosure of the payments to Shockley for lodging and relocation, Respondent argues that Petitioner failed to show prejudice, because evidence that Shockley received threats that caused him to fear for his life and safety in the community would have had a detrimental impact on Petitioner's case.

## **DISCUSSION**

In *Brady*, the Supreme Court held that "suppression by the prosecution of

evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. In *Giglio v. United States*, 405 U.S. 150, 153-54 (1972), the Supreme Court clarified that the rule stated in *Brady* applies to evidence undermining witness credibility, such as sentencing leniency promises. Evidence qualifies as "material" when there is "'any reasonable likelihood' it could have 'affected the judgment of the jury.'" *Wearry v. Cain*, 136 S. Ct. 1002, 1006 (2016) (quoting *Giglio*, 405 U.S. at 154). To prevail on his *Brady* claim, Petitioner need not show that he "more likely than not" would have been acquitted had the new evidence been admitted; he must show only that the new evidence is sufficient to "undermine confidence" in the verdict. *See id.* (quoting *Smith v. Cain*, 132 S. Ct. 627, 629-31 (2012)).

Both express agreements between the prosecution and cooperating witnesses, as well as "less formal, unwritten or tacit agreement[s]" are "subject to *Brady*'s disclosure mandate." *Bell v. Bell*, 512 F.3d 223, 233 (6th Cir. 2008) (en banc) (citing *Wisehart v. Davis*, 408 F.3d 321, 323–24 (7th Cir. 2005). Recently, in *Wearry*, 136 S. Ct. at 1004, the Supreme Court held that the fact that the police had told a witness for the state who was seeking a deal to reduce his existing sentence that they would "talk to the D.A. if he told the truth" was subject to *Brady*'s disclosure requirement.

> These rules are designed to protect a defendant's fundamental right to fairness under the Due Process Clause of the Fifth Amendment, for when the fate of the accused turns on the credibility of a witness, the prosecutor's failure to disclose a potential motive for bias or untruthfulness may result in grave injustice.

*United States v. Rushing*, 388 F.3d 1153, 1158 (8th Cir. 2004). In determining whether the suppression of impeachment evidence is sufficiently prejudicial to rise to the level of a *Brady* violation, a court must analyze the totality of the undisclosed evidence "in the context of the entire record." *United States v. Agurs*, 427 U.S. 97, 112 (1976). The cumulative effect of all suppressed evidence favorable to the defendant is considered, rather than considering each item of evidence individually. *Wearry*, 136 S. Ct. at 1004-05 (concluding that the cumulative effect of several *Brady* nondisclosures in a case in which the state's evidence "resemble[d] a house of cards," entitled the petitioner to a new trial).

The Court concludes from a review of the evidence, and after having an opportunity to observe the demeanor of the witnesses at the habeas hearing, that no formal or tacit agreement existed between the state and Shockley related to his February 18, 2002 felony charges. It is clear that no written or oral agreement was ever entered into, despite the notation in the February 7, 2003 Conflict Transfer Request Form that Taaffe "negotiated a deal for Jeff Shockley to testify against [Petitioner]." The Court credits the testimony of Reynolds and Taaffe that this notation may well have meant that Taaffe and the state were attempting to negotiate a deal for Shockley. The Court concludes that no such agreement was ever reached. "*Giglio* does not require disclosure of rejected plea offers; the duty to disclose is dependent upon the existence of an agreement between the witness and the government." *Rushing*, 388 F.3d at 1158 (citing *Collier v. Davis*, 301 F.3d 843, 849-50 (7th Cir. 2002)).

The evidence of a tacit agreement is the November 13, 2003 case note by Taaffe that Shockley agreed to testify against Petitioner and White and the state "hinted that there may

11

be a nolle after this is over." But this note's probative value is weak in light of Taaffe's contemporaneous statements to the plea court that there was no "quid pro quo" for Shockley's testimony against Petitioner and White. The existence of a tacit agreement is further refuted by the consistent testimony at the habeas hearing of Shockley and Chaddick, whose testimony the Court finds credible on this question. Each testified that no tacit agreement existed. Both Taaffe and Craddick testified that Shockley was likely to get probation anyway, in light of his young age and lack of a criminal history, and their testimony was not controverted. Indeed, the state did not "nolle" the felony charges against Shockley after he testified against Petitioner and White, and Taaffe made no mention of any such agreement at sentencing, further undermining the notion that the state had hinted it would or might do so in exchange for Shockley's testimony. To the contrary, the state made no mention of Shockley's trial testimony and recommended essentially the sentence it had originally offered that did not require Shockley's testimony against anyone.

Taaffe's testimony at the habeas hearing, when confronted with his case note, did not establish that Chaddick had hinted that the state might dismiss the felony charges against Petitioner if he testified against Petitioner and White. Rather, the credible graveman of Taaffe's testimony was that he and Shockley hoped that his testimony would help with the sentencing on the felony charges, and that Shockley's motive for testifying against Petitioner was because Petitioner had murdered Shockley's best friend. The Court credits Shockley's testimony that this is why he testified against Petitioner. Shockley's (and Taaffe's) hopes that Shockley's sentencing judge might view Shockley's cooperation

12

with the state favorably does not implicate *Brady*. *See Bell*, 512 F.3d at 233-34; *Wisehart v. Davis*, 408 F.3d 321, 325 (7th Cir. 2005).

The Court next concludes that even if the jury had heard that the state "hinted" to Shockley that it might dismiss his felony charges if he testified against Petitioner, there is no reasonable likelihood this information could have affected the judgment of the jury. As discussed below, this was not a case in which the state's evidence was like "a house of cards," but rather a case in which the evidence of guilt was strong. Most importantly, Stewart also identified Petitioner and White as two of the shooters. *See Sullivan v. Lockhart,* 958 F.2d 823, 825-26 (8th Cir. 1992) (holding that evidence of an alleged deal the state made with a witness to drop charges against her in exchange for her testimony was not material under *Brady* where other witnesses testified to the same effect as the witness in question).

The Court accords little weight to Haubrich's hearsay affidavit that was not subject to cross examination. Further the Court finds that Stewart's hearing testimony regarding his identification of Petitioner was credible. The Court did not find Johnson's testimony at the evidentiary hearing that Stewart told him the shooters were wearing ski masks such that he could not identify them, to be credible, based on Johnson's demeanor, his own motivations, and the evidence as a whole, including that no other witnesses to the crimes said the shooters were wearing ski masks. And, as noted above, there is no evidence of any *Brady* violation or plea agreement with respect to Stewart.

With respect to the state covering the cost of Shockley's hotel for eight days, as well as the financial help in relocating Shockley and his mother to another apartment at a

time when he was possibly in danger in connection with the crimes at issue, the Court assumes that this was Brady material that should have been disclosed. *See United States v. Librach*, 520 F.2d 550, 553-54 (8th Cir. 1975) (holding that the government had a *Brady* obligation to disclose that its witness was being held in protective custody, received immunity, and was paid almost $1,000 a month for a total of approximately $10,000 for subsistence). But the Court concludes that the nondisclosure does not undermine confidence in the verdict.[2] Lastly, the Court fails to see any impeachment value in the fact that at some point Shockley was willing to testify, and may have given a statement, against his brother in connection with an unrelated case, as there is no indication that Shockley ever did so in return for any benefit from the state. In light of Shockley's and Stewart's out-of-court identifications of Petitioner, their consistent versions of the crimes, the corroboration of their versions (other than the identity of the shooters) by other eyewitnesses and by physical evidence, including the evidence of Petitioner's fingerprints on the car driven to the shooting, the Court does not believe that it can be said that the verdict in this case was of questionable validity or that the state's case was built on a "house of cards." In sum, considering the entire record, and the cumulative effect of any and all nondisclosures, Petitioner's *Brady* claim fails.

## CONCLUSION

Accordingly,

---

2   Indeed, as respondent argues, such testimony could have invited either testimony, or speculation by the jury, that Shockley had been threatened.

**IT IS HEREBY ORDERED** that Petitioner's motion, as supplemented, to alter or amend judgment is **DENIED**.   (Doc. Nos. 76, 84.)

_____
AUDREY G. FLEISSIG
UNITED STATES DISTRICT JUDGE

Dated this 19th day of April, 2016.